IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

N2N Global, Inc,

     *Plaintiff,*

v.

     Case No. 5:24-cv-05110-TLB

Walmart Inc. f/k/a
Wal-Mart Stores, Inc.,

     *Defendant.*

---

# First Amended Complaint

---

**\* \* \* JURY TRIAL DEMANDED \* \* \***

Plaintiff N2N Global, Inc. ("Plaintiff") states:

1.  This lawsuit seeks a finding of liability, an award of actual and exemplary damages, and the imposition of permanent injunctive relief to address Defendant Walmart Inc.'s f/k/a Wal-Mart Stores, Inc. ("Walmart") willful and malicious misappropriation of Plaintiff's valuable assets and trade secrets related to Quality Control and Fresh Food Shrink management.

2.  On May 21, 2021, Ms. Susan Akin ("Akin"), a former Senior Business Process Manager at Walmart, informed Plaintiff Walmart had intentionally misappropriated Plaintiff's proprietary intellectual property, providing specific factual details that were not previously available to Plaintiff, despite the exercise of reasonable diligence.

## Parties

3.  Plaintiff is a Delaware Corporation with a registered address at 1209 Orange Street, Wilmington, Delaware 19801.

4.  Walmart is a Delaware corporation with its principal place of business and corporate headquarters located at 702 S.W. 8th Street, Bentonville, Arkansas 72716.

## Jurisdiction and Venue

5.  Pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. ("DTSA"), Plaintiff owns trade secrets that were misappropriated by Walmart. As these trade secrets pertain to a product or service used in, or intended for use in, interstate or foreign commerce, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331.

6.  Complete diversity of citizenship exists between the parties, and the amount in controversy exceeds $75,000. Accordingly, this Court also has diversity subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).

7.  Plaintiff's state law claims are logically related to the same aggregate core of operative facts as Plaintiff's federal claims under the Defend Trade Secrets Act, granting this Court supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

8.  Walmart conducts substantial and non-isolated business activities within Arkansas, including committing tortious acts within the state. Thus, this Court has both general and specific personal jurisdiction over Walmart.

9.  The Parties executed a ███████████████████████████ ██████████████████████████ wherein they agreed that Arkansas courts would have exclusive jurisdiction and venue for any disputes arising from the ██████ *See* **Exhibit 1**.

10.  Venue is proper in this Court pursuant to the parties' express agreement, as well as under 28 U.S.C. § 1391(b)(1) (where the defendant resides) and 28 U.S.C. § 1391(b)(2) (where a substantial part of the events giving rise to the claim occurred).

– 2 –

## Common Facts to All Causes of Action

11.  Walmart sells groceries and other perishable food items both online and in its physical store locations across the United States, including Arkansas, as well as in other countries worldwide.

12.  The term "Fresh Food Shrink" refers to the loss of unconsumed and wasted food, a significant issue that adversely affects food supply wholesalers and retailers.

13.  Plaintiff has made substantial investments in proprietary, innovative solutions, including specialized software, to assist clients in developing integrated supply chain management systems that maximize productivity and minimize waste.

14.  Plaintiff has developed unique know-how and show-how, industry expertise, and specialized proficiency in the areas of Quality Control and Fresh Food Shrink management.

15.  Plaintiff's expertise encompasses specific data flow systems, advanced data security measures, and comprehensive software code, including: (1) back-end data processing; and (2) front-end code related to user input and experience, as accessed through laptops and computer tablets.

16.  Plaintiff's proprietary systems include cloud-based software, mobile applications, and business intelligence solutions, all of which are integral to its offerings.

17.  Walmart lacks the level of expertise that Plaintiff possesses in the domains of Quality Control and Fresh Food Shrink software solutions.

18.  Recognizing the need for a significant overhaul of its fresh food handling processes, Walmart issued a ████████████████████████

19.  Prior to issuing ████████ Walmart's fresh food inspection processes were inefficient, relying on a patchwork of outdated systems that were largely paper-driven, time-intensive, and lacked automation.

20.  Walmart extended an invitation to Plaintiff to respond to its ████

21.  At the time Walmart issued its ▇ it lacked an adequate internal research team capable of effectively addressing its Quality Control and Fresh Food Shrink issues.

22.  Walmart did not intend to award a contract to any party that submitted a proposal in response to the ▇ and had not assigned any quantifiable contract value to the ▇

23.  Walmart misrepresented and concealed the true purpose of its ▇ in its communications with Plaintiff.

24.  Walmart's actual intent in issuing the ▇ was to improperly acquire Plaintiff's trade secrets, know-how, and show-how related to solving Quality Control and Fresh Food Shrink challenges.

25.  Walmart's true purpose in issuing the ▇ was to gain insights into the Quality Control and Fresh Food Shrink industry without compensating Plaintiff.

26.  The ▇ was designed to provide Walmart with insights into the Quality Control and Fresh Food Shrink industry without compensating Plaintiff for its valuable expertise.

27.  Walmart's ▇ presented a significant business opportunity for Plaintiff, and the prospect of doing business with Walmart served as a compelling inducement for Plaintiff to respond.

28.  Under the false pretense of conducting a Security Review, Walmart induced Plaintiff to disclose trade secrets and other confidential information, including its know-how, show-how, specialized expertise, solution design, and architecture in Quality Control and Fresh Food Shrink.

29.  Plaintiff took commercially reasonable measures to protect its know-how, show-how, trade secrets, and other confidential business information. To safeguard all proprietary and confidential information exchanged, the Parties executed a comprehensive ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ on or around July 14, 2015. **Exhibit 1**.

30.  The Parties' ██ prescribed an extremely broad definition of "Confidential Information" which was to remain safe and protected by the ██



31.  In reliance on Walmart's promises, Plaintiff worked extensively to meet and exceed Walmart's ██ with the expectation it would be awarded a lucrative contract.

32.  Enticed by Walmart's promises, Plaintiff responded to the ██ by providing Walmart with an innovative Product Inspection Quality Control Solution ("PIQCS").

33.  Plaintiff's PIQCS is not publicly available and is not readily known, fitting the definition of Confidential Information as defined by the Parties' ██

34.  Throughout the relevant period, Plaintiff took commercially reasonable steps to maintain the secrecy of PIQCS.

35.  Plaintiff reasonably considered PIQCS to be confidential and/or proprietary, and it is expressly classified as Confidential Information under the Parties' ▮▮▮  *See* **Exhibit 1**.

36.  PIQCS fully met the requirements outlined in Walmart's ▮▮▮

37.  Without revealing the enabling aspects of its computer-based trade secrets, or its know-how and show-how, Plaintiff describes the general solutions offered by its PIQCS, below.

(a)  PIQCS systematically collects substantive, reliable data to build a profile of factors that maximize the efficiency of fresh food inspections.

(b)  PIQCS and related graphical user interface ("GUI") provides an inspector with quick access to USDA standards and a database Plaintiff built that includes USDA parameters layered with customer defined standards called specifications or "Specs", and doing so helps facilitate accurate analysis of the condition of food products.

(c)  PIQCS selectively assesses data, aggregates data, and subjects such datasets to proprietary analytics and reporting across a secure software platform for relevant market participants.

(d)  PIQCS is an original and proprietary quality control solution that includes original software code, together with data management and process workflow procedures and data storage systems, to establish and provide a specific data flow and central storage location across all locations for quality control, logistics, replenishment, and for Walmart and other supply chain partners to post and access information related to product inspections, product specifications, and supplier and location scorecards with the ability to access business intelligence reporting on demand.

(e)  PIQCS includes a refined GUI experience which is driven both by original software code and having intuitive controls, input systems, and complex image handling for mobile devices, including tablets.

(f)  PIQCS established a broad software platform to enable mobile tablet-based inspections providing Walmart's employees instant access to both USDA guidelines in a structured data format not available through public means and to selected reference materials to increase speed, accuracy, and effectiveness of fresh food inspections.

(g)   PIQCS is designed to enable Walmart employees to upload contemporaneous fresh food inspection data into uniform, stable, interconnected, and secure servers.

(h)   PIQCS has capacity to automatically generate compliance reports for Walmart relating to purchase order information, out of stock or short positions, pulls of degraded products, and credits from suppliers for items falling below the standard product quality. Plaintiff also provided prototypes for ripening management solutions.

(i)   PIQCS utilizes mobile-based inspections that remove the need for paper records and the creation of paper records.

(j)   PIQCS permits a user quick access to reference material to assist a food inspector in properly evaluating the most up-to-date requirements for the specific food item before Walmart accepts the product at the Distribution Center. Food specific requirements may arise from federal inspection standards or internal standards of quality or freshness.

(k)   PIQCS serves to reduce the amount of time spent on paper-based inspection from 30–45 minutes to 10–15 minutes or less.

(l)   PIQCS integrates with larger data systems and provides real-time information on purchase orders and shipments to prevent out-of-stock or "short" positions, which can help grow retail sales.

(m)   PIQCS enables Walmart to evaluate inspector capability to properly assess product quality at DC receipt while also continuously training the inspector via real-time positive reinforcement of positive behaviors.

(n)   PIQCS better facilitates and manages critical features including produce ripening to ensure optimal quality, which can increase sales by as much as 15% and increase customer satisfaction.

(o)   PIQCS automates supplier performance scorecards using enhanced, accurate, fact-based metrics that aggregate data using as many available data points as possible to provide a holistic view of the relationship and ongoing analysis of the quality of goods supplied.

(p)   PIQCS enhances document compliance and ensures compliance with the Food and Drug Administrations' Hazard Analysis and Critical Control Points ("HACCP") standards.

(q)   PIQCS provides responsive information regarding a Sustainability Index, on-time deliveries, specification compliance, pulls, store credits, and purchase order conformance, to name a few of the comprehensive features.

(r)   PIQCS enhances the inspection process and accelerates throughput by enabling inspectors to capture photos directly from the tablet using a preferentially compressed file format. This solution reduces load and transmission time, as the smaller file size imposes less strain on the network compared to the large files produced by standalone digital cameras.

(s)   PIQCS tracks loss of product (*i.e.*, Pulls & Store Credits) back to each supplier after delivery, which can be evidence of improper handling prior to acceptance by Walmart, saving Walmart as much as 1% of sales.

(t)   PIQCS significantly reduces internal email messages and replaces with role appropriate system notifications without human intervention.

(u)   PIQCS supports IDC receipts with a more accurate process to catch quality and condition issues prior to receipt of produce by Walmart.

(v)   PIQCS scans the supplier's Product Traceability Initiative ("PTI") labels (*i.e.*, GS1 compliant label), thereby reducing human input errors while also speeding data entry.

(w)   PIQCS provides detailed item- and specification-level data to Walmart's suppliers (*e.g.*, commodity, variety, sub-variety, pack, label, grade, size, lot, pack date).

(x)   PIQCS reduces the time to handle and process inspections as well as to generate reporting.

(y)   PIQCS permits Managers and other authorized stakeholders' ability to "validate" inspections results remotely or electronically from any supported device.

(z)   PIQCS removes or decreases the use of paper for the Quality Control documentation process and auto-generates user-customizable reports and notifications.

(aa)  PIQCS operates in a secure environment.

## Teaching Walmart

38.  In response to the ██████ and subject to Walmart's agreement not to use or disclose Plaintiff's intellectual property, as memorialized by the ██████ Walmart invited Plaintiff to collaborate confidentially on a pilot program at Walmart's Bartlesville, Oklahoma distribution center.

39.  Plaintiff installed a functional version of PIQCS on several Samsung-branded tablets specifically for use in connection with Walmart's ██████

40.  Operating under the protections of the ██████ Plaintiff began working directly with Walmart's Susan Akin, a Senior Business Process Manager and authorized representative of Walmart.

41.  Akin held the position of Quality Control Regional Manager for Walmart's West Division.

42.  Plaintiff provided extensive training to Akin on its systems and procedures, including working models of PIQCS installed on one or more of Plaintiff's tablets.

43.  As part of her role, Akin was responsible for overseeing the implementation of PIQCS in the pilot program at the Bartlesville, Oklahoma distribution center, including reviewing and testing the solution.

44.  During this confidential pilot program, Akin and other Walmart quality control employees at the Bartlesville location were introduced to and utilized PIQCS.

45.  Under the ██████ protections, Plaintiff also provided PIQCS to Walmart's authorized agent and Vice President of Quality Control, Chuck Tilmon ("Tilmon"), who gained extensive proprietary knowledge about the operation of PIQCS.

46.  Throughout the pilot program, other Walmart quality control employees also acquired substantial knowledge of PIQCS, gaining direct access to its programming, know-how, show-how, interface, and architecture. Over several months, multiple Walmart quality control associates at the Bartlesville facility used PIQCS on a daily basis.

47.  In alignment with Walmart's ██████ requirements and under the protections of the Parties' ██████ Plaintiff delivered a comprehensive presentation and detailed disclosure of its Partner Management solution ("PIQCS") to Walmart's team. This audience comprised up to 20 quality control employees and other representatives at Walmart's Home Office.

48.  The instructional presentation included an interactive, hands-on demonstration utilizing Samsung tablets to showcase the functionality, stability, and sophistication of Plaintiff's proprietary solution.

49.  Walmart's authorized agents provided exceptionally positive feedback regarding PIQCS.

### Walmart's Misappropriation of Plaintiff's Trade Secrets

50.  Beyond the scope of the ███ requirements, Walmart improperly pressured Plaintiff to disclose highly sensitive, programmatic aspects of PIQCS, using one or more false pretenses to justify the disclosure request.

51.  Specifically, on September 3, 2015, Walmart's Senior Director of Produce, Laura Himes ("Himes"), demanded that Plaintiff respond to a series of security questions contained in an Excel spreadsheet provided by Walmart.

52.  Himes' questions were based on the Council on CyberSecurity's "Critical Security Controls."

53.  Typically, Critical Security Controls involve routine and generalized questions about top-level structure of computer systems.

54.  The stated purpose of these Critical Security Controls is to evaluate the risk of exposure to potential attack vectors within a given computer system.

55.  The Critical Security Controls "are a recommended set of actions for cyber defense that provide specific and actionable ways to stop today's most pervasive attacks. . . . An underlying theme of the Controls is support for large-scale, standards-based security automation for the management of cyber defenses." Critical Security Controls, COUNCIL ON CYBERSECURITY, https://web.archive.org/web/20150905215816/ http://www.counciloncybersecurity.org/critical-controls/ (captured Dec. 1, 2015).

56.  Because the Critical Security Controls seek to identify "standards-based automation," the Critical Security Controls focus on elements common to any deployed

system such as user security levels, devices utilized, backup plans, ports used by systems, and security configurations of network devices. *Id*.

57.  Typical Critical Security Controls Questionnaires do not require disclosure of code or field-specific data.

58.  Plaintiff answered all these top-level general questions as required by Walmart and completed Walmart's Critical Security Controls spreadsheet, returning it completed on September 9, 2015.

59.  On September 10, 2015, Walmart held a Security Risk Compliance Review conference call to discuss Plaintiff's responses to the Critical Security Controls questionnaire.

60.  Walmart representatives invited to the Security Risk Compliance Review call included Walmart's authorized representatives: Senior Manager Information Systems Division ("ISD") Chad Staudt, Tom Wolfe, James Brown, Tomas DeMott, Mac Williams, Terri Shiery, and Himes.

61.  The Security Risk Compliance Review call concluded with Walmart's ISD informing Plaintiff that its submission for the Critical Security Controls was deemed acceptable. ISD indicated that the matter would be forwarded to Walmart's Vendor Management Office ("VMO"), the team responsible for contract negotiations.

62.  However, instead of proceeding with contract negotiations, Walmart's authorized agent, Himes, again insisted that Plaintiff provide a more detailed examination of their software architecture.

63.  Walmart's agent, Himes, set a firm deadline of November 4, 2015, demanding that Plaintiff provide their database model, including field descriptions, as well as an end-to-end architectural diagram.

64.  The information requested by Walmart's agent, Himes, was not required for the Critical Security Controls, was never raised during the Security Risk Compliance Review, and did not align with standard industry security practices.

65.   Plaintiff was initially skeptical about the necessity and purpose of disclosing trade secret information, such as field names, to Walmart. Consequently, Plaintiff declined to provide this information, asserting that it was not required to comply with Walmart's ██

66.   In response, Walmart and Himes acknowledged the sensitivity of the trade secrets requested.

67.   Nevertheless, Walmart's authorized representatives sought to obtain the trade secret information by offering knowingly false assurances of confidentiality, falsely assuring Plaintiff that the proprietary information would be fully protected under the Parties' ██ and would remain Plaintiff's property.

68.   To further compel and induce Plaintiff, Himes falsely assured them that Walmart had no intention of replicating Plaintiff's internal architecture or trade secret-protected technology.

69.   Himes also falsely asserted that Plaintiff's trade secrets—specifically, the database model, including field descriptions, and the end-to-end architectural diagram—were essential for conducting the Security Risk Compliance Review.

70.   Additionally, Himes falsely claimed that without the disclosure of Plaintiff's trade secrets, including highly confidential computer data and specific field values, Walmart could not complete the Security Risk Compliance Review.

71.   To compel and induce Plaintiff, Himes falsely claimed that the disclosure of Plaintiff's trade secrets—including highly confidential computer data and specific field values—was mandatory for Walmart's Security Risk Compliance Review.

72.   Himes further falsely represented that Walmart could not proceed with the live testing phase of the pilot program without Plaintiff's trade secret disclosure.

73.   Himes also falsely asserted that Walmart would not award Plaintiff a contract pursuant to the ██ unless the trade secrets were disclosed.

74.    These false statements were made by Himes, and others, to Plaintiff's Vice President of Business Development, Robert Nelson, and Plaintiff's Chairman and Chief Innovation Officer, Angela Nardone, with the intent of coercing Plaintiff into disclosing its entire body of confidential trade secrets.

75.    Plaintiff relied on Walmart's false statements of absolute confidentiality and nonuse pursuant to the ███ and Walmart's false statements concerning the mandatory nature of Plaintiff disclosing its trade secret architecture and field names when providing Plaintiff's trade secrets.

76.    Walmart breached its confidentiality obligations under the ███ by secretly duplicating and creating derivative works from Plaintiff's proprietary information.

77.    Furthermore, Walmart concealed from Plaintiff its wrongful actions of duplicating Plaintiff's proprietary information and developing an in-house software solution.

### Walmart's Rejection

78.    Plaintiff reasonably expected to be awarded ███ with Walmart following the ███ given the extremely positive reviews and Walmart's requests for the implementation of additional user-interface features in the GUI.

79.    On June 10, 2016, Walmart's Regional Quality Control Manager, Keith Mitchell, informed Plaintiff of Walmart's decision not to retain them ███.

80.    Mitchell's termination of the relationship between Walmart and Plaintiff effectively cut off Plaintiff's access to Walmart's quality control team and ended their access to Walmart altogether.

81.    Notwithstanding Walmart's decision not to award Plaintiff a contract following Walmart's ███ the Parties' ███ **Exhibit 1**, at ¶ 2(a), obligated Walmart to ███ ███████████████████████████████████████:

███████████████████████████████████████████



82.  In the following year, Walmart announced that it had developed and implemented an in-house software solution to address its Quality Control and Fresh Food Shrink issues.

83.  Walmart did not release its in-house software solution to the public.

84.  Plaintiff had no way of knowing to what extent, if any, Walmart utilized their information in developing the in-house software solution.

## Walmart's Zest Labs Litigation

85.  In August 2018, Walmart was sued by Zest Labs, Inc. for theft of trade secrets related to the development and use of Walmart's in-house software for food safety and Fresh Food Shrink technology.

86.  Nearly all substantive pleadings in the case were sealed from public view under a strict protective order. *See* Protective Order at 5, *Zest Labs, Inc. v. Walmart Inc.*, Case No. 4:18-cv-00500-JM (E.D. Ark. Jan. 25, 2019), [ECF No. 87].

87.  The protective order in the Zest Labs case prevented Plaintiff from reasonably assessing the extent to which Walmart may have misappropriated Zest Labs' or Plaintiff's software and trade secrets.

88.  The success of Zest Labs in suing Walmart reasonably suggested to Plaintiff that Walmart's software was likely developed using Zest Labs' trade secrets rather than Plaintiff's.

89.  A federal jury awarded Zest Labs a $115 million verdict against Walmart for the theft of Zest Labs' trade secrets related to food safety and Fresh Food Shrink technology.

90.  Walmart's insistence on a protective order in the Zest Labs case effectively prevented Plaintiff from uncovering the true nature and origins of Walmart's in-house freshness tracking system.

91.  The computer source code at issue in the *Zest Labs* case was subjected to a RESTRICTED CONFIDENTIAL–SOURCE CODE label, which was so tightly controlled, in fact, that viewing such material was permitted only on a "single computer configured without Internet access or network access to any other computers. The single computer will be password protected and made available in a secure, locked viewing room." Protective Order at 5, *Zest Labs, Inc. v. Walmart Inc.*, Case No. 4:18-cv00500-JM (E.D. Ark. Jan. 25, 2019), [ECF No. 87].

92.  Plaintiff did not participate in the federal lawsuit brought by Zest Labs.

93.  Plaintiff was unable to determine the extent to which Walmart may have used Plaintiff's proprietary material in developing its freshness tracking system software.

## Plaintiff's Discovery of Walmart's Theft

94.  Approximately six weeks after the $115 million jury verdict against Walmart in the Zest Labs case, on May 21, 2021, Akin, a former Senior Business Process Manager at Walmart with firsthand knowledge of relevant events, finally informed Plaintiff of Walmart's past intentional misappropriation of Plaintiff's trade secrets.

95.  On May 21, 2021, Akin first informed Plaintiff of the timing of Walmart's intentional misappropriation, revealing that the theft of Plaintiff's tablet, which contained an enabling version of Plaintiff's proprietary material, occurred on May 25, 2016.

96.  On May 21, 2021, Akin informed Plaintiff of the location of Walmart's misappropriation, revealing that the theft of Plaintiff's Samsung tablet, which had Plaintiff's proprietary material installed, occurred at Walmart's Home Office in Bentonville, Arkansas.

97.  On May 21, 2021, Akin provided specific details to Plaintiff about who acted on behalf of Walmart, revealing that Walmart's Quality Control Regional Manager, Gary Foster ("Foster") improperly converted and retained Plaintiff's Samsung tablet.

98.  On May 21, 2021, Akin revealed to Plaintiff the involvement of another bad actor within Walmart, stating that he personally witnessed Foster handing Plaintiff's Samsung tablet to Walmart's Chuck Tilmon.

99.  Akin confirmed that Plaintiff's proprietary material was fully responsive to Walmart's ████

100.  Akin confirmed that Plaintiff would have been fully capable of delivering the consulting services to Walmart if the ████ had been awarded to them.

101.  Akin's observations affirmed that Plaintiff was prepared, willing, and fully equipped to provide competent services in accordance with the ████ requirements.

102.  Akin stated that she had direct access to both software solutions and confirmed that Walmart's in-house solution closely resembles and is substantially similar in presentation and functionality to Plaintiff's proprietary material.

103.  Plaintiff considers Akin to be an extremely credible and reliable source.

104.  Walmart, through the past actions of its authorized agents, specifically Tilmon, furtively planned and secretly executed a positive act of fraud to keep Plaintiff's cause of action concealed.

105.  Foster, in not returning the Samsung tablet initially on the day of the meeting perpetuated an affirmative act of fraud such that the fraud concealed itself.

106.  Tilmon, in receiving the Samsung tablet from Foster, continued Walmart's affirmative act of fraud in a way that the fraud concealed itself.

107.  Walmart's software and graphical user interface is not generally available to the public.

108.  Plaintiff was not able to access or otherwise inspect Walmart's software using reasonable due diligence.

109.  Without Akin's disclosure of Walmart's misconduct, Plaintiff would never have discovered Walmart's fraud and misappropriation of their trade secrets and proprietary PIQCS software.

110.  Akin specifically informed Plaintiff that Walmart's software offered the same features and solutions as PIQCS. She further stated that after Plaintiff's pilot and demonstration, Walmart's IT team developed a software solution with minimal consultation from Walmart's Quality Control Associates—yet the software was precisely tailored to the exact use cases identified during the pilot and demonstration.

111.  Akin declared to Plaintiff, no earlier than May 21, 2021, that Walmart used, and continues to use, PIQCS.

112.  Plaintiff's technology is highly valuable and provides authorized users of PIQCS with a significant competitive advantage in the fresh food industry.

113.  The conversion, misappropriation, use, and extraction of the enabling version of Plaintiff's trade secrets by Walmart's Tilmon and Foster, as stored on Plaintiff's Samsung Tablet, constitutes willful misappropriation of Plaintiff's valuable business and intellectual property.

114.  The conversion, misappropriation, use, and fraudulent procurement by Walmart's Himes, through her demand for Plaintiff's 'database model, including field descriptions, and end-to-end architectural diagram,' constitutes willful misappropriation of Plaintiff's valuable business and intellectual property.

## Unsuccessful Demand for Return

115.  After discovering Walmart's misconduct and consulting legal counsel, Plaintiff issued a written demand to Walmart for the return of all confidential information, including PIQCS software and Samsung tablet. The demand also requested Walmart's agreement to refrain from using any of Plaintiff's confidential information and to destroy all copies of such information.

116. The ████ obligates Walmart to █████████████████████████ ███████████████████████████████████ .

117. Walmart, through its IP counsel John Kinton, has refused, neglected, or failed to respond to Plaintiff's formal demand to cease using Plaintiff's confidential information, know-how, show-how, or proprietary code, and has not returned Plaintiff's Samsung tablet.

## Count One — Misappropriation of trade secrets
## in violation of 18 U.S.C. § 1831 et seq.

118. Plaintiff incorporates by reference all prior allegations.

119. Walmart violated the DTSA.

120. Pursuant to 18 U.S.C. § 1836(b), Plaintiff has a civil right of action against Walmart in that Plaintiff is the owner of a trade secret as described above, including but not limited to PIQCS and trade secrets installed on Plaintiff's Samsung tablet, which Walmart secretly retained and used to develop its own in-house software solution.

121. In conformity with 18 U.S.C. § 1836(b), Plaintiff's trade secrets relate to a product or service used in, or intended for use in, interstate or foreign commerce. Plaintiff's trade secrets concern the sale, transport, distribution, and delivery of fresh food products from Defendant's distribution centers to its more than 5,000 stores nationwide and more globally, as managed by Plaintiff's software solutions.

122. Federal law defines "trade secret" as including "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." 18 U.S.C. § 1839(3).

123. Plaintiff has an extensive background and know-how and show-how in USDA standards, HAACP Compliance, company product specifications, product quality

management, quality management business processes, computer processes, software architecture, and data-driven solutions.

124.   Plaintiff is an owner of other trade secrets reflected in communications and made by Plaintiff to Walmart in connection with Plaintiff responding to Walmart's ███ for food safety and freshness systems and protocols.

125.   Plaintiff has invested millions of dollars in its business expertise, computer solutions, and trade secrets relating to this technology and Walmart was aware of and sought such expertise and assets.

126.   In conformity with 18 U.S.C. §§ 1839(3)(A)–(B), Plaintiff has taken reasonable measures to keep such information secret; and PIQCS derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

127.   At all relevant times, Plaintiff has taken commercially reasonable steps to protect and preserve the integrity of its trade secrets and confidential information. This included implementing a comprehensive ███ with Walmart and establishing internal protocols that required ███ with contract software employees and independent contractors.

128.   Plaintiff's software solutions and trade secrets are not easily replicated and are subjected to reasonable efforts by Plaintiff to ensure and preserve the confidential nature of such trade secrets.

129.   Despite Plaintiff's commercially reasonable precautions and protections against unauthorized use or disclosure, Walmart willfully targeted and subsequently misappropriated Plaintiff's intellectual property, hardware, trade secrets, know-how, and show-how through improper means.

130.   In violation of 18 U.S.C. §§ 1832 and 1836, Walmart acquired and used Plaintiff's trade secrets. Walmart's authorized representatives circulated the ███ with

no intention of awarding a contract to any of the responding parties, as it is Walmart's internal policy to weigh the cost of development against the potential costs of litigation arising from the theft of confidential information and technology.

131.  Walmart quality control managers and agents, Tilmon and Foster, knew or had reason to know that secretly retaining and using Plaintiff's Samsung tablet, which contained Plaintiff's valuable trade secrets, constituted improper means.

132.  Walmart's authorized representative, Himes, knew or had reason to know that her false claim—that the disclosure of Plaintiff's trade secrets, including highly confidential computer data and specific field values, was mandatory for Walmart's Security Risk Compliance Review—constituted improper means.

133.  In violation of 18 U.S.C. § 1839(5)(B)(ii)(II), Walmart likewise acquired Plaintiff's trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, namely, the Walmart-prepared ████ served to protect Plaintiff's information and Walmart was not authorized to use such trade secret information without compensation.

134.  Plaintiff was not able to learn the extent to which Walmart misappropriated Plaintiff's intellectual property and trade secrets and PIQCS and related programming due to the continued sequestration efforts by Walmart to prevent an enabling disclosure of its in-house software.

135.  It was not until May 21, 2021 that Plaintiff, exercising reasonable diligence, discovered the fraud and concealment, together with the extent of Walmart's bad acts and intentional misappropriation of PIQCS.

136.  Pursuant to 18 U.S.C. § 1836(b)(3)(A), the Court should issue a permanent injunction to forever prevent Walmart from utilizing all source code derived from the direct copying and unauthorized use of PIQCS, know-how, and trade secret protected software solutions.

137.  Pursuant to 18 U.S.C. § 1836(b)(3)(A), the Court should issue a permanent injunction to forever prevent Walmart from utilizing the know-how and show-how accompanying PIQCS having the functions, features, and design aspects identified by Plaintiff to Walmart under non-disclosure and confidentiality agreements.

138.  Pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(I), Plaintiff is entitled to its actual losses in an amount to be determined at trial.

139.  Pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(II), Plaintiff is entitled to damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss in an amount to be determined at trial.

140.  Defendant's misappropriation is willful and malicious and thereby entitles Plaintiff to an award of exemplary damages pursuant to 18 U.S.C § 1836(b)(3)(C).

141.  Defendant's misappropriation is willful and malicious and thereby entitles Plaintiff to an award of its reasonable attorney's fees pursuant to 18 U.S.C § 1836(b)(3)(D).

### Count Two — Misappropriation of trade secrets in violation of Ark. Code Ann. § 4-65-601 et seq.

142.  Plaintiff incorporates by reference all prior allegations.

143.  Walmart violated ATSA.

144.  The ATSA defines trade secret as information that: (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Ark. Code Ann. § 4-75-601(4).

145.  The Arkansas Supreme Court has set forth six factors to consider when determining whether information is a trade secret: (1) the extent to which it is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the company to guard its

secrecy; (4) its value to the company and competitors; (5) the amount of effort or money the company expended in developing it; and (6) the ease or difficulty with which others could properly acquire or duplicate it. *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 991 S.W.2d 117, 120-22 (1999); *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1108–09 (8th Cir. 2020).

146. Plaintiff discovered Walmart's theft and misconduct no earlier than May 21, 2021, when Walmart former Senior Business Process Manager Akin informed Plaintiff that Walmart stole PIQCS and other assets.

147. Plaintiff acted at all relevant times in a commercially reasonable manner when believing Walmart would honor its promises and obligations of confidentiality and nonuse of Plaintiff's proprietary information as set forth in the parties' █████

148. Plaintiff's trade secrets set forth in PIQCS and related programming comprise a formula, pattern, compilation, program, device, method, technique, or process, which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

149. Plaintiff protected its PIQCS and related programming using a nondisclosure agreement with Walmart.

150. Plaintiff protected its PIQCS and related programming using passwords and nondisclosure agreements with its employees and independent contractors, and such protections are commercially reasonable in the relevant industry.

151. Plaintiff possessed valuable know-how, show-how, computer data solutions, computer code, and other trade secrets related to the tracking and optimization for physical inspections and ripening management of fresh food.

152. Specifically, Plaintiff possessed the software, algorithms, data field inputs, and the application to optimize quality control inspections and fresh food ripening management programs.

153.  Plaintiff took reasonable precautions to maintain and protect the secrecy of its trade secret information, which included internal restrictions to the information, and the use of non-disclosure agreements with third parties. Plaintiff disclosed the information in this case to Walmart under an agreement that Walmart drafted, and which promised mutual confidentiality and non-disclosure of proprietary information, including trade secrets.

154.  Plaintiff disclosed information to Walmart under the expectation that Walmart would abide by the terms of the ▮▮▮▮ would maintain the confidentiality of such information, and would not use such information for Walmart's own pecuniary benefit.

155.  Plaintiff's confidential information includes trade secrets and/or other proprietary information that derives independent economic value from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

156.  Walmart misappropriated Plaintiff's valuable intellectual property and trade secrets for Walmart's own use in connection with Walmart's in-house technology.

157.  Walmart acquired such information from Plaintiff with reason to know that the trade secret was acquired by improper means, *i.e.*, Tilmon retained Plaintiff's Samsung computer tablet and Foster thereafter delivered it to Walmart's internal IT department with direction to obtain a software copy of PIQCS and programming.

158.  Walmart authorized representative Himes knew or had reason to know that her false claim that disclosure of Plaintiff's trade secrets—including highly confidential computer data and specific field values—was mandatory as part of Walmart's Security Risk Compliance Review, constituted improper means.

159.  Tilmon, Foster, and Himes, acting as Walmart's authorized agents, unlawfully obtained knowledge of Plaintiff's trade secrets through improper means.

160.  Walmart's misappropriation of Plaintiff's confidential and trade secret information has caused substantial injury.

161.  Through its conduct in requesting a proposal from Plaintiff and providing an ███ and also through email and phone communications, Walmart falsely represented that it would maintain Plaintiff's confidential information and that Walmart would not use Plaintiff's confidential information without Plaintiff's authorization.

162.  Walmart's improper actions were intended to, and did in fact, prevent Plaintiff from discovering Walmart's theft until Akin alerted Plaintiff and provided evidence of Walmart's theft on May 21, 2021.

163.  Pursuant to Ark. Code Ann. § 4-75-604(a), the Court should issue a permanent injunction to forever prevent Walmart from utilizing all source code derived from the direct copying of Plaintiff's software solutions.

164.  Pursuant to Ark. Code Ann. § 4-75-604(a), the Court should issue a permanent injunction to forever prevent Walmart from utilizing the know-how and show-how accompanying PIQCS having the functions, features, and design aspects identified by Plaintiff to Walmart under non-disclosure and confidentiality agreements.

165.  Pursuant to Ark. Code Ann. § 4-75-606(a), Plaintiff is entitled to recover from Walmart damages for the actual loss caused by the misappropriation.

166.  Pursuant to Ark. Code Ann. § 4-75-606(b), Plaintiff is also entitled to recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

167.  Pursuant to Ark. Code Ann. § 4-75-607(3), Walmart's misappropriation was willful and malicious, entitling Plaintiff to its reasonable attorneys' fees.

### Count Three — Conversion of Plaintiff's Samsung Tablet

168.  Plaintiff incorporates by reference all prior allegations.

169.  Plaintiff owned a Samsung tablet, which is an item of personal property. Ark. Model Jury Instr., Civil AMI 425.

170.  Akin informed Plaintiff on May 21, 2021, that Walmart secretly retained Plaintiff's Samsung tablet.

171.  Akin was an authorized representative of Walmart at the time Akin specifically witnessed Walmart's Foster personally handing Plaintiff's Samsung tablet to Walmart's Tilmon, which constitutes an admission by Walmart that it exercised dominion over Plaintiff's Samsung tablet.

172.  The tort of conversion is the exercise of dominion over property in violation of the rights of the owner or the person entitled to possession. *Grayson v. Bank of Little Rock*, 334 Ark. 180, 188, 971 S.W.2d 788, 792 (1998). Walmart's intent in possessing Plaintiff's Samsung tablet was to exercise dominion or control over the property in a manner that was inconsistent with Plaintiff's possessory and business interest.

173.  The fair market value of the Samsung tablet at the time of its conversion in 2015 exceeded $799.

174.  Fair market value is not the only measure of the damages recoverable in an action for conversion; the circumstances of the case may require a different measure, including the expenses incurred as a result of the conversion. *First Nat'l Bank of Brinkley v. Frey*, 282 Ark. 339, 342, 668 S.W.2d 533, 535 (1984).

175.  Plaintiff has incurred substantial costs and expenses because of the conversion of the Samsung tablet, regardless of whether PIQCS was installed on it.

176.  Since PIQCS was also installed on the Samsung tablet, and given the circumstances of the case, Plaintiff is entitled to additional damages proximately caused by Walmart's conversion of the device.

### Count Four — Breach of Contract

177.  Plaintiff incorporates by reference all prior allegations.

178.  Plaintiff and Walmart entered into the ███ **Exhibit 1**.

179.  The ███ was supported by valid legal consideration.



183.  As a result of Walmart's breach, Plaintiff has suffered actual damages, the amount of which will be determined by the trier of fact.

WHEREFORE, Plaintiff prays:

(a)   For the Court to issue a permanent injunction of proper scope pursuant to 18 U.S.C. § 1836(b)(3)(A) and Ark. Code Ann. § 4-75-604(a);

(b)   For a jury to award actual damages, both past and future for the enumerated claims pursuant to 18 U.S.C. § 1836(b)(3)(B) and Ark. Code Ann. § 4-75-606(a);

(c)   For a jury to award damages for unjust enrichment not covered by actual damages pursuant to 18 U.S.C. § 1836(b)(3)(B) and Ark. Code Ann. § 4-75-606(b);

(d)   For a jury to award damages, including punitive damages, for conversion of the Samsung tablet;

(e)   For a jury to award damages for breach of contract;

(f)   For the Court to fix exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), upon a finding that Walmart "willfully and maliciously misappropriated" Plaintiffs trade secrets and business property;

(g)   For the Court to award Plaintiff its attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D); Ark. Code Ann. § 4-65-607(3); and Ark. Code Ann. § 16-22-308;

(h)   For the Court to award all other amounts to which Plaintiff is entitled under the Arkansas Trade Secrets Act, the Defend Trade Secrets Act, and/or Arkansas law; and

(i)   For any other remedy which this Court deems just and reasonable.

PLAINTIFF N2N GLOBAL, INC.

_____
Mark Murphey Henry, Ark. Bar No. 97170
Otto Matthew Bartsch, Ark. Bar No. 2022264
HENRY LAW FIRM
P.O. Box 4800
Fayetteville, Arkansas 72702
Telephone:   (479) 368-0555
Email:          mark@henry.us
Email:          otto@henry.us

*Counsel for Plaintiff*

## VERIFICATION

I have read the foregoing and investigated the claims made against the defendant Walmart and the facts on which the claims are based, and I verify the facts as alleged, and verify them to be true and correct to the best of my knowledge.

August 14, 2024

Angela Nardone
Authorized Agent of N2N Global, Inc.